IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA          )
                                  )
        v.                        )          Case No. 1:16-cr-135 (RDA)
                                  )
AHMAD SAYED HASHIMI,              )
                                  )
        Defendant.                )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Ahmad Sayed Hashimi's ("Defendant" or "Petitioner") Motion to Vacate Sentence pursuant to 28 U.S.C. § 2255 (the "Motion"). Dkt. 138. This matter is fully briefed and ripe for disposition. Considering Petitioner's Motion, Memorandum in Support (Dkt. 179), the Government's Opposition (Dkt. 185), the evidence and argument adduced during the two-day evidentiary hearing on the Motion, the parties' subsequent Closing Briefs (Dkts. 201, 202), and Petitioner's Reply (Dkt. 204), the Court DENIES Petitioner's Motion for the reasons that follow.

## I. BACKGROUND

The background recited here is drawn from all of the filings in this case. Where matters are quoted, they are specifically cited. Otherwise, the factual matters asserted herein are drawn from the records in this case.

### A. Pretrial Proceedings

On April 12, 2016, Petitioner was arrested pursuant to a warrant and had his initial appearance with his first counsel. On April 15, 2016, a preliminary hearing was held, at which time Petitioner's first counsel was terminated, and Bruce Johnson was appointed to represent Petitioner. On June 23, 2016, Petitioner wrote a letter to the court requesting new counsel:

> I am writing in Regards to being appointed a new attorney due to in-Effective counseling by my current attorney Bruce Johnson JR. He has not spend not has talked for a total of more then 50 mins all together since Ive been in jail and is strongly pressuring me to sign my plea without even knowing or discussing all the facts in my case by asking me personally about my case. last time we saw each other tensions rised because of me wanting a new attorney and we shouted at each other and now I dont feel comfortable putting my freedom in his hands since he left on bad terms with me. Also when he wanted me to sign the plea he wasn't event aware of the forfeiture of a property clause in the plea which I had to bring to his attention which tells me he didn't even read the plea fully himself before asking me to sign it. I am respectfully asking for a new attorney.

Dkt. 34 (all punctuation, spelling, and grammatical errors in original); *see also* Dkt. 35 (second, almost identical letter filed on the same day).

On June 22, 2016, Petitioner was indicted on four counts: (1) Conspiracy to Distribute Oxycodone; (2) Conspiracy to Distribute Cocaine; (3) Kidnapping; and (4) Interstate Domestic Violence. Dkt. 31. On June 24, 2016, Petitioner was arraigned before now-retired U.S. District Judge Liam O'Grady. At the end of the hearing, Petitioner made an oral motion for new counsel, which was denied:

> THE DEFENDANT: . . . I would like to ask for a new court-appointed lawyer, for ineffective counseling at this moment.
>
> THE COURT: How many conversations have you had with Mr. Johnson to date?
>
> THE DEFENDANT: As a total, eight, for a total of 45 minutes altogether, including phone calls and visits. The last time we were in a meeting, I told him about that, I wanted a new attorney. And we kind of left on heated terms. He said, well, if you want time, I have got to go, I have got to go. In 15 seconds he left. And I was willing to sign, I was about to sign it, he grabbed it and said, no, just forget it, forget it, we'll just deal with it, I have to go. So –
>
> THE COURT: What were you going to sign?
>
> THE DEFENDANT: The plea.
>
> THE COURT: What was he going to sign, Mr. Johnson?

MR. JOHNSON:   Your Honor, he and I had about three meetings and two conversations concerning the Government's offer.  I think the Government would concede –

THE COURT:  Oh, the Government had made a plea offer?

MR. JOHNSON:  Right.

THE COURT: And you were discussing that plea offer?

MR. JOHNSON: Right.  And the Government, I am sure will agree, that there were multiple discussions and revisions of it.  It came time that the Government gave a deadline, and we had one extension.  And when I went to see him, I explained it was a deadline.  I first called him and told him the deadline.  And then I said, I'm going to come see you. So when I got there, there was reluctance.  And, obviously, I know that if he's forced or feels pressured to sign it -- so then at that point I said, well, let's hold off, you're going to be indicted, and then we'll have to revisit it later.  Having done this awhile, I know that if the client is not enthusiastic about signing it, it never goes well.  And so, I wasn't going to put him in a position where he felt he had to sign it.

THE COURT: This was a preindictment plea offer?

MR. JOHNSON: Correct.

THE COURT: Okay.

MR. JOHNSON: And we had six weeks, so it wasn't like it was, you know -- well, I think you understand the picture.

THE COURT: I do, yeah.  Well, Mr. Hashimi, there is no reason – you're entitled to court-appointed counsel.  You're not entitled to court-appointed counsel of your choice.  And you ultimately decide whether you go to trial or whether you accept a plea offer.  Your counsel, Mr. Johnson, is tasked with explaining the evidence to you, making recommendations, talking about the possible penalties if you are convicted, but you make the decisions as to whether you go to trial or not.  And you, obviously, were uncomfortable with the plea offer, and that's absolutely fine, you do what you think you need to do.  And Mr. Johnson's role is to inform you of negotiations with the Government and the evidence against you.  There is no reason to relieve Mr. Johnson at this stage just because he made certain recommendations to you.  When you said you were reluctant to enter into an agreement, he followed through with your instructions.  And we're here this morning at arraignment.  So your oral motion to appoint new counsel for you is denied.  You work with Mr. Johnson.  He is a veteran attorney in this court.  He has appeared on innumerable occasions before me and tried many cases, and he has tried them competently, and he is a professional, and you're fortunate to have somebody with his experience

working on your behalf. So, Mr. Johnson, if you determine that we should revisit this, we will revisit it. But otherwise your motion is denied.

Dkt. 108 at 6:3-8:25.

On September 22, 2016, a motions hearing was held before Judge O'Grady, which included motions filed by Mr. Johnson on behalf of Petitioner. On September 23, 2016, a status conference was held at which Mr. Johnson appeared by phone. At the end of the status conference, Petitioner renewed his motion for new counsel, providing Judge O'Grady with a letter stating that Petitioner had not spent enough time with Mr. Johnson, that Petitioner did not believe that Mr. Johnson had had time to go through discovery, and that generally their relationship was not a good one. Dkt. 109 at 6:22-7:4. In response to questioning by Judge O'Grady, Mr. Johnson confirmed that he had received discovery and had gone over that discovery with Petitioner. *Id.* at 7:5-10. Judge O'Grady asked Mr. Johnson, "Are you going to spend time this weekend further working on the case with Mr. Hashimi?"[1] *Id.* at 7:11-12. Mr. Johnson replied:

> Yes, sir. Just so the record is clear, you know, we have had no less than six personal meetings and too many phone calls to count. So I definitely believe -- obviously, I know Mr. Hashimi is concerned and nervous as anyone would be expected to be under the circumstances. But I am fully prepared. And as the Court knows from our colloquy a couple days ago, if I were not, I wouldn't hesitate to bring it to Your Honor's attention.

---

[1] Mr. Johnson testified before this Court that he understood Judge O'Grady to have instructed him to be sure that he communicated with Petitioner over the weekend but did not interpret Judge O'Grady as specifically directing him to visit Petitioner in person. Dkt. 203 at 90:9-15. Mr. Johnson explained that, due to the nature of the case and that Petitioner would not be testifying, he believed his preparation at his office would be more valuable to Petitioner than the hours of travel to visit Petitioner in person—thus, he called Petitioner but did not visit him in person. *Id.* at 90:22-91:11. Mr. Johnson testified that he worked on Petitioner's case from 11:00 a.m. or noon until about 8:00 or 9:00 p.m. both days that weekend. *Id.* at 91:12-21.

Mr. Johnson further testified before this Court that his associate who spoke Farsi was present for calls with Petitioner because, although Petitioner spoke English well, Mr. Johnson thought it would help to improve his relationship with Petitioner and show Petitioner he was committed to doing everything possible for Petitioner to have the associate present and to allow Petitioner to speak in his native language on some issues. *Id.* at 86:22-87:10.

4

*Id.* at 7:11-20.  Judge O'Grady later returned to the issue:

> THE COURT: All right. Thank you. All right, Mr. Hashimi, what else did you want to say?
>
> THE DEFENDANT: I want to say when Mr. Johnson has came to me with a plea, he made me feel extremely uncomfortable by misinforming me about the terms and conditions of the plea, which is misleading to me. Due to his actions, he has jeopardized my opportunities by not being able to sign the plea due to his actions and his representations. It all started when the first plea he came with had a forfeiture of a house clause in it, which he never brought it up to me or even mentioned it to me, which made me think twice about trusting his advice before –
>
> MR. JOHNSON: I'm sorry, Your Honor, I can't hear everything.
>
> THE COURT: All right. Mr. Hashimi has indicated that the first plea agreement -- well, what else besides the first plea agreement?
>
> THE DEFENDANT: The first one, which he never mentioned nor brought it up to me, which made me think twice about his representation. Another time he came with a plea agreement, it ended with a heated verbal confrontation with him, which he only gave me exactly two minutes of his time before he started shouting and stormed out of the room, grabbing the plea bargain and saying, forget it, I don't have time. Leaving the room saying, I have to see another client. Not giving me the opportunity to sign it. Not giving me the opportunity to sign it. This event occurred because he overheard me talking to the deputy when he was walking me to Mr. Johnson about me not being happy with his representation and wanted to get a new lawyer and how do you do that. And as soon as the deputy opened the door, Mr. Johnson was furious and mad and started shouting to me to not to waste his time and get my own attorney then. And he took the plea and stormed off.
>
> THE COURT: Mr. Hashimi, this is -- this is just personality differences. This isn't professional level preparation, which you are entitled to. And I have seen nothing that indicates –
>
> MR. JOHNSON: Your Honor, if I can just respond because I think this is important. The comments are belied by -- and the Government I think would agree. We have had extensive conversations, multiple extensions to try to see if we could reach a resolution, even as late as last week. And I have done everything that Mr. Hashimi has asked from me. I have gone back and forth to the jail as many times as I can to explain it. And he has rejected offers, as he is entitled to. And the Government knows that. So, you know, the record and the e-mails support multiple communications. I've done everything he's asked. I have counted every time that he has asked me and been diligent in trying to do the best I can to reach a resolution that everybody could live with. And we could not do it. So I vehemently reject any

indication that I have not spent enough time with him going over the offers. And I think the Government would support that, as well as the numerous e-mails that have gone back and forth trying to reach a resolution of this case.

THE COURT: All right. Ms. Russell, what's the last plea offer made by the Government?

MS. RUSSELL: Your Honor, there have been multiple plea offers extended in this case. There was –

MR. JOHNSON: Your Honor, the last offer –

THE COURT: Well, let me have Ms. Russell indicate what –

MR. JOHNSON: Okay. I'm sorry.

THE COURT: So there is no misunderstanding.

MR. JOHNSON: Yes, sir.

MS. RUSSELL: The Government extended a preindictment plea offer. A post-indictment plea offer immediately following indictment, that was open until I believe late August. We reextended that same post-indictment plea offer after discovery had been completed in early September. And then last week -- excuse me, the Thursday approximately two weeks ago now, we extended an unusually late plea offer due to a number of circumstances in the case. That plea offer was to a count of conspiracy to distribute cocaine and a count of kidnapping. We did have extensive negotiations with Mr. Johnson with respect to that plea offer. He indicated to us that his client was potentially amenable in pursuing a plea offer, but was not interested in pleading to two counts. That he would plead to either the cocaine distribution conspiracy or the kidnapping. We initially rejected that offer. Mr. Johnson called, to be frank, our supervisors and had long and extensive discussions with them. And we did end up extending a plea offer to a single count of kidnapping. We went back and forth with Mr. Johnson. And our understanding was that that was as a result of meetings with Mr. Hashimi doing extensive edits to the statement of facts in support of that single count of kidnapping. Frankly, we spent most of the day on Monday editing and revising that plea offer. And at approximately 5:30 or 6 o'clock on Monday evening Mr. Johnson informed us that his client had rejected that offer. There is no plea offer currently on the table.

THE COURT: All right.

MS. RUSSELL: Although –

THE COURT: Go ahead.

MS. RUSSELL: Excuse me, Your Honor. Yesterday after meeting with his client Mr. Johnson did ask us whether the Government would be willing to extend an offer again, or the same offer. And we responded that at this point so close to trial, we would not. And his option was to plead to the indictment –

MR. JOHNSON: Yes. After we left the motions hearing Mr. Hashimi asked that I reach out to the Government. Again at his request, I made another call. I think that call was yesterday -- or by e-mail, I'm sorry.

THE COURT: All right. And, Mr. Johnson, you've communicated these plea offers to Mr. Hashimi, is that correct?

MR. JOHNSON: Yes, yes, sir. Every offer was communicated in person and then numerous follow-up phone calls to reiterate and confirm his position as it relates to the statement of facts, what he was willing to take. And this has been Mr. Hashimi's decision, Your Honor, and I have to abide by that, you know.

THE COURT: No, that's –

MR. JOHNSON: There have been numerous conversations of what was in his best interests. And this is the decision that Mr. Hashimi made.

THE COURT: Is that correct, Mr. Hashimi, you've rejected the plea offers after discussion with Mr. Johnson?

THE DEFENDANT: Yes, but if I could share one more thing. Is that when he came with the last plea, once again, it's the relationship, the mistrust. It wasn't because of the plea, I didn't accept it. It's when he came with the plea, just the whole thing, once again, he said, your Guidelines, Mr. Hashimi, are 158 -- low 100s to 168 months. So I was told, here, you want to sign it. So I don't trust him. So I have to bring it to his attention, Mr. Johnson, do you know I have four priors? His exact words were, oh, Mr. Hashimi, I didn't know. So that made me feel once again uncomfortable. Like what is else behind this scene. And that was the only -- other than that, just once again brought up red flags.

THE COURT: All right. I find that the plea offers have been communicated to you. Mr. Johnson did extensive negotiations with substantial success on your behalf. And you rejected those plea offers. So that's a decision you made. Personalities are -- you don't have to like each other in order for Mr. Johnson to do a professional job and do his job on your behalf. I have no question that he is gone above and beyond what's required of him to try and assist you. He will continue to prepare for trial. And we'll begin trial of this case at 10 o'clock on Monday morning. All right, you're excused.

MR. JOHNSON: We appreciate it. And just as to that last comment, Your Honor, that's inaccurate. I was fully aware of Mr. Hashimi's record. I mean, there is no

way that I would be able to even sit down and go over Guidelines without knowing his record. So I ask that -- well, I just reject that wholeheartedly, Your Honor. I appreciate you hearing me out.

THE COURT: Okay. All right. Thank you, you all.

*Id.* at 9:2-15:8.

On September 26, 2016, the jury trial commenced.  Before the jury was brought in, the

following discussion was had with Judge O'Grady:

MS. RUSSELL: The last thing, Your Honor. I apologize. Defense counsel has conveyed to us this morning that his client has requested that the Government extend a plea offer, or at least that he inquire as to whether the Government would be willing to extend a plea offer at this point. And I would just like to put on the record that that was conveyed to us, and our position is at this point, about to start trial, we will not be extending a plea offer. The defendant, of course, is welcome to plead to the indictment. But we would not be extending a plea offer at this time.

THE COURT: All right.

MR. JOHNSON: Your Honor, the only reason that was brought to Your Honor's attention, as you know, is some indication that I had not been talking to him. So I want to make sure the record is clear that I have done everything, including contact the Government over the weekend at Mr. Hashimi's request, Your Honor, to see if there was any room for discussion. So I just want to make sure the record is clear.

***

THE COURT: . . . Mr. Hashimi, if you want to pursue a plea further, the Government has made its position clear that you have to plead to the indictment. And, you know, there is Guideline issues which, whether you plead to one offense or two offenses or three or four offenses, at some stage things get grouped. And so, when you get the opportunity, talk to Mr. Johnson, if you want to, about how that all factors into the ultimate sentence that you will be looking at, if you want to pursue that further. All right, sir? Okay.

THE DEFENDANT: And also, Your Honor, when we were here on Friday you asked Mr. Johnson if -- that I asked for effective counsel to spend time with me. And you clearly asked that he come prepare with me, sit down before for trial, give me some time. And the jail records would prove that he did not visit me. He called me one time for three minutes, and it was pertaining to exactly what the F were you doing? What the F was that all about? Why did you embarrass me in front of the judge? And I want this to be on the record. And also, he told me three witnesses' names, and I didn't even know them, I don't know who they are. And he didn't

8

explain who they are. And he just hung up the phone without saying bye. So I still have yet to see discovery all the way. The first time I have seen discovery was on Thursday when I was in court. And I asked me if I could get a copy. And he said, no, you have got to read it now. It was the size of a textbook. So while the court is going on, I'm trying to look at the discovery. I don't even think a heavy duty Xerox machine could copy that many pages in ten minutes. I haven't looked at nothing to prepare for the case, who is making the allegations against me. I have no chance to discuss it. I still don't know what's going on. And that's my constitutional right to a fair trial. And I still don't know what's going on, who the witnesses are to prepare, nevertheless to speak to Mr. Johnson about it.

THE COURT: All right.

THE DEFENDANT: And he said that I'm nervous because trial is coming up, but I have made these requests three months before, these same things, and I wasn't granted them.

THE COURT: Okay. All right. You have made your statement on the record. You continue to consult with Mr. Johnson, take notes, and write them down if you have questions you would like Mr. Johnson to address. And we are moving forward with trial today.

Dkt. 110 at 8:11-12:11.

## C. Trial

After a three-day jury trial, Petitioner was convicted of four counts of a criminal indictment: (1) Conspiracy to Distribute Oxycodone in violation of 21 U.S.C. §§ 841 and 846; (2) Conspiracy to Distribute Cocaine in violation of 21 U.S.C. §§ 841 and 846; (3) Kidnapping in violation of 18 U.S.C. § 1201(a)(1); and (4) Interstate Domestic Violence in violation of 18 U.S.C. § 2261(a)(2). Petitioner was accused of being the leader of a drug distribution network that sold cocaine and oxycodone pills roughly between 2009 and 2015.

At trial the Government's key witness was Hilina Damte. In 2011, Damte met Petitioner, and the two began a romantic relationship. At the time, Damte was aware that Petitioner was a cocaine dealer and suspected that Petitioner may also have been involved in illegal prostitution through online websites. Damte eventually became involved in Petitioner's drug distribution operations. A major part of Hashimi's drug distribution involved acquiring oxycodone pills

through fake prescriptions. Damte testified that she acquired fake prescriptions for Petitioner through his contact in a local dentist's office. Damte obtained the phony prescriptions and then had them filled by other co-conspirators. Damte would resell the pills and give the proceeds to Petitioner. Testimony at trial reflected that Petitioner sold different drugs through Damte and other co-conspirators to insulate himself from law enforcement. The Government also presented evidence that Hashimi had an apparently comfortable lifestyle—including owning a car and houses titled in his parents' names—without being able to demonstrate a legitimate source of income.

The Government introduced evidence that Petitioner's relationship with Damte was abusive and contentious. In November of 2013, Petitioner became suspicious that Damte was withholding some of the oxycodone pills obtained through the fraudulent prescription scheme. The two began a verbal argument that quickly escalated into a violent altercation with Petitioner choking and striking Damte. Damte fled from Petitioner and, in the process, took cash and cocaine from him. Petitioner began to search for Damte and went as far as to offer drugs and money to anyone who could locate her.

On November 8, 2013, Petitioner located Damte, and, working with other conspirators, developed a ruse to lure her to meet him. Damte was sitting in the back of another individual's vehicle when Petitioner drove to where she was waiting and blocked her escape. Petitioner and his associates surrounded the vehicle, and Petitioner began to beat Damte. Petitioner forcefully pulled Damte out of the vehicle and then proceeded to place her in his conspirator's vehicle. The men then drove Damte to Petitioner's vehicle where she was forced inside, and Petitioner then drove Damte from Virginia into the District of Columbia. At a stoplight in the District, Damte was able to escape and eventually contact law enforcement, who took her to the hospital.

During the trial, Petitioner and Mr. Johnson passed a series of handwritten notes during Ms. Damte's testimony:

> [Hashimi:] It's funny how [the ex-girlfriend] remembers everything to the teeth precoached.
>
> [Johnson:] One of the reasons I recommended the plea to you of [illegible] count. You now have unlimited exposure.
>
> [Hashimi:] I never met her nor know Sharon we need her to testify.
>
> …
>
> [Johnson:] I don't understand why you would take the risk.
>
> [Hashimi:] She [is] clearly lying we need to prove it with Sharon.
>
> [Johnson:] C'mon Hashimi c'mon dude. You really think jury is going to totally disbelieve her.

Dkt. 161-1 at 2. Following the conclusion of the Government's case, Mr. Johnson moved to dismiss all counts, and Judge O'Grady denied the motion. Dkt. 112 at 517:16-25. Mr. Johnson then adduced evidence on Petitioner's behalf through three witnesses.

At the close of evidence, Mr. Johnson and Petitioner discussed the possibility of pleading guilty on the interstate kidnapping charge and the assault charge. Dkt. 203 at 66:19-67:15. Mr. Johnson then inquired, out of the presence of the jury, whether Judge O'Grady would permit Petitioner to plead guilty to the kidnapping and domestic violence charges, but Judge O'Grady denied the request:

> MR. JOHNSON: . . . Mr. Hashimi would like to tender a plea of guilt[y] to kidnapping and interstate domestic violence. We would ask the Court to accept the plea to those counts. Of course, we will be asking that he be given reduction for acceptance of responsibility. I recognize this is more of a gray area at this point. I do believe that he is entitled to accept responsibility as to those two counts and take that off the plate for the jury, Your Honor.
>
> THE COURT: Ms. Russell, do you want to be heard?

MS. RUSSELL: Your Honor, my understanding of the defendant's options are that he can plead straight up to all of the counts in the indictment or to none of them, and that he does not at this point have the authority to determine which counts the jury hears. Those counts are intrinsically entwined to some extent. They were charged together for a reason. The nature of the control that the defendant exercised over the primary victim of the kidnapping is in large part the way that he accomplished the distribution of drugs for the Oxycodone and conspiracy counts that are charged in Counts 1 and 2. And we think that it is inappropriate for the Court to sever those at this point.

THE COURT: Well, I haven't had an occasion to address that issue. I certainly think that prior to trial Mr. Hashimi could have pled to certain counts and gone to trial on the other counts. But having had the case go through with all the evidence having been adduced, I'll deny that motion at this time and let the jury deliberate on all four counts. I don't see any prejudice to Mr. Hashimi in doing so. But your offer to plead to those two counts is a matter of record now. If at the appropriate time you want to make a motion that that should be considered in his acceptance of responsibility, we will consider that at sentencing.

MR. JOHNSON: Thank you for hearing me out, Your Honor.

Dkt. 112 at 572:25-574:9. The Government also put on the record at that time that, on the second morning of trial, Mr. Johnson conveyed to the Government that Petitioner had renewed his request for a plea offer, and the Government again denied the request, stating that he could only plead to the entire indictment. *Id.* at 574:11-20.

Petitioner and Mr. Johnson provide conflicting accounts of what happened next. Mr. Johnson filed an affidavit stating the following, which is consistent with his discussion with Judge O'Grady:

Prior to closing, I advised Mr. Hashimi we should concede the assault and kidnapping counts because the evidence was overwhelming, but that I would challenge the evidence and try to prevent any conviction on the remaining two (2) counts. Mr. Hashimi nodded in affirmance and did not object or ask any questions concerning my intent to concede kidnapping and assault. I believed Mr. Hashimi was on board with this strategy. Although Mr. Hashimi and I had conflict prior to trial, once the trial started he felt very comfortable with me and trusted me.

Dkt. 185-1.  He further explained that he "thought concession would build credibility with the Jury

and increase the chances Mr. Hashimi would be acquitted of the two (2) remaining counts."  *Id.*

Mr. Johnson provided further testimony consistent with his affidavit before this Court:

> Q. What did you talk with Mr. Hashimi about before closing arguments?
>
> A. I told him that I'm going to concede the charge on the domestic violence count
> and kidnapping. I don't think that we're giving away anything because I think the
> evidence is overwhelming on that. I think the challenging the drug charges is
> something that I think we can do with a straight face. I think conceding the counts
> -- I said, you're not giving away anything because you're probably going to be
> convicted of that anyway. But what you do is hopefully build rapport with the
> jurors. You know, I think later on I explained to him that that I would argue that we
> were accepting responsibility on those counts.
>
> Q. And how did he respond?
>
>  A. With that one he nodded, but he didn't look me in the eye. There were no -- he
> didn't say any words. His only communication was a nod, confirmed that he heard
> what I said.

Dkt. 203 at 96:21-97:13.

Petitioner filed an affidavit stating that, "[a]t no time before or during the trial did I give

my attorney, Bruce A. Johnson, Jr., permission to concede, during his closing argument to the jury,

my guilt on any counts of the Indictment."  Dkt. 140.  Petitioner further stated that he had filed

federal tax returns for 2011, 2012, and 2014,[2] and that, "at no point in advance of trial, and only

minimally during trial, did my attorney consult with me about the details of my case or discuss

with me a theory of my defense."[3]  *Id.*  Petitioner later testified before this Court that Mr. Johnson

---

[2] *But see* Dkt. 91 at 35 ("The probation officer . . . obtained records from the Internal
Revenue Service.  Those records show that no returns were filed on the defendant's social security
number for the years 2007 to 2012."); Dkt. 113 at 10 (Petitioner affirming he had "gone over the
[Pre-Sentencing Investigation] report" and had no "changes or corrections").

[3] Petitioner later admitted during his testimony before this Court that he was consulted on
the Indictment, witnesses, and plea offers, and that his affidavit was "overstated."  Dkt. 203 at
51:5-8, 52:24-25, 59:3-8, 72:25-73:3.

never told Petitioner his plan to tell the jury he was guilty of any of the crimes, stating that he never wanted to plead guilty:

> Q. Okay. Did he ever tell you at any point that his plan was to tell the jury that you were guilty of any of the crimes you were charged with?
>
> A. No.
>
> Q. Now, I want to focus on that. When I asked you if you ever talked about how he was going to treat the victim on the stand, and your answer was, you didn't remember, when I asked you if he ever told you he was going to tell the jury you were guilty, you remembered. Why is it that you can remember that portion, but not whether Mr. Johnson talked about what he was going to do when the victim was on the stand?
>
> A. Because I never wanted to plea to none of the charges, never pled guilty, so that was never -- if I wanted to plea to any of them, I would have pled to them. I would have remembered that.

Dkt. 203 at 23:3-17.

During closing, after noting various items of evidence that the Government did not introduce about the drug charges, Mr. Johnson stated, *inter alia*:

> The only witnesses the Government brings are people that are looking for a ticket out of jail. Hmmm. People that have had access to his paperwork in jail. People that are in jail looking to find a way out of jail who are approached out of the blue by an aggressive agent, meaning no disrespect, but clearly he is aggressive, he is going to state courts and jails to meet and find and talk to people. An agent that knows what he wants. An agent that lays out what he needs.
>
> You start talking, cases start getting dismissed. People start getting released. The jailhouse doors are open. Things are working. Your case is delayed until we see what you have to say. You can see the picture here, no one has to bang you over the head what's going on.
>
> The last few days I've done very little, if no questioning relating to the kidnap and domestic violence. Shame on Mr. Hashimi, shame on him. I am sure he was humiliated that Hilina was cheating on him behind his back, I am sure, but that doesn't excuse what he did. And if he were allowed to, he would accept responsibility for that right in front of you.
>
> But the drug stuff is exaggerated, it's lies. Drug addicts and liars who knew what to say about Hashimi, knew what was needed, and knew what of the missing picture

was needed to fill in to try to land an elephant, to work their way out of jail, that's what this is about, and to avoid incarceration.

We know Ms. Damte can lie. How strong would a woman have to be let a man punch her in the face and beat her repeatedly and look an officer in the eye and say, nothing happened, I beat up myself. Don't look in the apartment, it's on me. How manipulative must she be to run runners for a year or so? To direct them where to go. To hide her relationship with Mr. Bryant. To hide what she was doing from Mr. Hashimi. The ability to lie when it suits her.

Savvy enough to lie to an officer and mislead an officer over and over again, multiple different officers, several at a time.

Her own boyfriend, Chris Bryant, says she's a manipulator, she's conniving. But the Government would have you believe through her that he's the elephant in the room. She's the elephant in the room.

She sat there and lied to your face. I had no connections to dental offices. I had no connections in pharmacists' offices. We know that was a lie. It was her.

And she tries to minimize her involvement. I don't know anything about prescriptions, playing the dumb role. She was the one creating them.

* * *

As I said to you in my opening, this is a case of misdirection to try to make you believe that this strung-out drug abuser on heroin and cocaine is an elephant. He is not an elephant. He is not the elephant. The elephant was the Government's first witness.

We're asking you to hold him accountable for what he did, but that's it. There will be a day of reckoning before this judge on that and that alone is what we're requesting. Don't fall into the trap of holding him accountable and having him punished for something he didn't do.

Dkt. 112 at 620:3-621:23. As stated *supra*, the jury ultimately found Petitioner guilty on all four counts.

## D. Post-Trial Process

Petitioner directly appealed his conviction to the Fourth Circuit, which unanimously affirmed. *See* 718 Fed. App'x 178 (4th Cir. Jan. 22, 2018). Dkts. 93, 116. Petitioner then filed a petition for a writ of certiorari. *See* Petition for a Writ of Certiorari, No. 18-5184 (June 9, 2018).

The Supreme Court vacated Petitioner's conviction and remanded to the Fourth Circuit for further consideration in light of *McCoy v. Louisiana*, 584 U.S. 414 (2018).[4]  *See* 139 S. Ct. 377 (2018). The Fourth Circuit again affirmed Petitioner's conviction.  *See* 768 Fed. App'x 159, 162-63 (4th Cir. Apr. 25, 2019); Dkt. 122.  Petitioner filed a motion for rehearing *en banc*, which the Fourth Circuit denied.  Dkt. 124.

Petitioner then timely filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255. Dkts. 138, 139.  Judge O'Grady denied Petitioner's 28 U.S.C. § 2255 motion without an evidentiary hearing.  Dkt. 162.  Petitioner then appealed. Dkt. 164.  The Fourth Circuit vacated the denial of Petitioner's 28 U.S.C. § 2255 motion and remanded it for further factual development on whether Mr. Johnson informed Petitioner of the plan to concede guilt, and whether Petitioner accepted, rejected, or did not comment on Mr. Johnson's plan.  Dkt. 170.

On remand, the case was reassigned to this District Judge as Judge O'Grady had retired. On March 20, 2025, this Court appointed counsel for Petitioner.  Dkt. 178.  On May 16, 2025, Petitioner filed a memorandum in support of his motion.  Dkt. 179.  On August 28, 2025, the Government filed an opposition to the motion.  Dkt. 185.  This Court then held a two-day evidentiary hearing from November 20-21, 2025.  Dkts. 198, 200.  During that hearing both Petitioner and Mr. Johnson testified.  Counsel for both parties spent a significant portion of their examinations impeaching the opposing witness.  The Government confronted Petitioner regarding several inconsistencies in his statements, leading to the concession that some of his allegations in his affidavit were overstated.  Defense counsel also cross-examined Mr. Johnson at length regarding various bar proceedings instituted against him regarding his handling of client finances

---

[4] In *McCoy*, the Supreme Court recognized that, when a defendant seeks to maintain his innocence, defense counsel must abide by the objective and may not concede guilty.  584 U.S. at 422-23.

and accusations of self-dealing.  At the end of the hearing, the Court ordered the parties to file

further written closings in support of their positions based on the evidence adduced at the hearing.

On December 5, 2025, the parties filed their respective written closings, Dkts. 201, 202, and, on

December 10, 2025, Petitioner filed a reply, Dkt. 204.

## II.  LEGAL STANDARD

A motion under 28 U.S.C. § 2255 is a civil collateral attack upon the judgment of

conviction, and therefore Petitioner bears the burden of proving his grounds for collateral review

of his sentence by a preponderance of the evidence.  *Jacobs v. United States*, 350 F.2d 571, 574

(4th Cir. 1965).  Here, Petitioner specifically raises an ineffective-assistance-of-counsel claim

under *McCoy v. Louisiana*.  *McCoy* holds that a client has a Sixth Amendment right to decide

whether to maintain innocence or concede guilt at trial.  *Id.* at 426-28.  Under the *McCoy* test,

defense counsel must take two steps to provide constitutionally adequate counsel.  First, defense

counsel must consult with a defendant prior to conceding guilt.  *Id.* at 423-24.  Second, defense

counsel must honor the defendant's wishes if the defendant objects to conceding guilt.  *Id.*  If the

defendant does not express any wish and remains silent, defense counsel "may permissibly guide

the defense pursuant to the strategy she best believes to be in the defendant's best interest."  *Id.* at

424.

## III.  ANALYSIS

Here, Petitioner contends that Mr. Johnson did not consult him prior to conceding the

assault and kidnapping counts at trial.  By contrast, Mr. Johnson contends that, prior to closing, he

advised Petitioner to concede the assault and kidnapping counts, to which Petitioner nodded in

affirmance and did not object or ask further questions.  Although there are some issues with the

testimony of both Petitioner and Mr. Johnson, the Court ultimately finds Mr. Johnson to be the

more credible witness regarding the facts at issue here. Mr. Johnson's demeanor on the stand and the consistency in his testimony now with the recordings of his actions at the time of trial lend weight to his testimony. In general, the Court finds Petitioner to be less credible based on his presentation on the witness stand and his apparent (and conceded) efforts to exaggerate certain facts in order to enhance his version of events. Upon consideration of the evidence, the Court finds that: (1) Mr. Johnson consulted with Petitioner prior to conceding guilt, (2) Petitioner did not object to conceding guilt, and (3) Mr. Johnson then conceded guilt because he believed it to be in Petitioner's best interest.

Petitioner has not shown that he was not consulted by Mr. Johnson prior to Mr. Johnson conceding guilt to the jury. After reviewing the evidence and assessing both Petitioner and Mr. Johnson's demeanor and responses on the witness stand, the Court finds that Mr. Johnson's testimony regarding this event to be credible and that Petitioner's testimony was not credible.

As a preliminary matter, the evidence before the Court supports Mr. Johnson's version of events. The record shows that Mr. Johnson routinely consulted with Petitioner on critical matters and that numerous plea offers were made to, discussed with, and sought by Petitioner during the course of the proceedings. Petitioner even admitted on the stand before this Court that he and Mr. Johnson did discuss the possibility of pleading guilty at the close of evidence to the interstate kidnapping and assault charges. Although seeking a plea to those counts is not dispositive of the issue of whether Petitioner consented to admitting guilt on the counts before a jury, it is strongly corroborative of Mr. Johnson's version of events. Importantly, Mr. Johnson's statements in open court—in front of and uncontradicted by Petitioner—regarding the possibility of pleading guilty on the eve of trial undercut Petitioner's contention now that "I never wanted to plea to none of the charges." Dkt. 203 at 23:3-17. Moreover, the record shows that Petitioner was not hesitant to

interject and voice his opinions when he disagreed with Mr. Johnson or thought he should take a different approach, including in front of Judge O'Grady. Thus, it is noteworthy that Petitioner did not bring any objection to Judge O'Grady's attention during or immediately after closing.

Mr. Johnson's testimony about the core issue appeared to the Court to be credible. Mr. Johnson admitted that his relationship with Petitioner was "rocky" at the beginning. Nonetheless, he sought to improve their relationship by bringing in an assistant who spoke Farsi, Petitioner's native language, despite Petitioner's proficiency in English to show he was committed to Petitioner's cause and to make sure nothing was lost in translation. *Id.* at 86:22-87:10. This specific recollection also adds to the credibility of Mr. Johnson's memory of this specific case, despite his busy workload at the time. Mr. Johnson credibly explained that he had initially submitted an affidavit which had the name of a different member of his office in the precatory language because he had used a prior affidavit as a template for formatting and standard language. Although Mr. Johnson has faced disciplinary proceedings and been suspended or disbarred in certain jurisdictions, he admitted to having made mistakes resulting in these actions, and the allegations that led to his disbarment did not concern the issues of trial strategy or concession of guilt presently before the Court.[5] The Court also notes that Mr. Johnson had no reason to lie to

---

[5] On February 7, 2024, Mr. Johnson and the Attorney Grievance Commission of Maryland jointly petitioned the Supreme Court of Maryland to impose a sixty-day suspension stayed in favor of twelve months of probation for issues related to Mr. Johnson's role as Trustee of a Trust. Pet. Ex. G. Petitioner argued that the agreed facts showed that Mr. Johnson forged a client's signature on an affidavit. Not so. Petitioner appears to be relying on a promissory note that Mr. Johnson signed twice—once in his role as Trustee for a client trust and once on behalf of his real estate company. Pet. Ex. E. While the joint petition describes this as self-dealing, it does not show that Mr. Johnson forged a signature, and the Court does not find the admissions in the joint petition to sufficiently discount Mr. Johnson's testimony before this Court on the core issue of this proceeding.

this Court on the issue before it—*McCoy* was decided after the trial in this case. Thus, a lack of consultation at that time could be understood and excused.

By contrast, Petitioner's testimony about the core issue was not credible. As a preliminary matter, Petitioner admits that he has an interest in the case's outcome. Moreover, when Petitioner was asked how he could remember that Mr. Johnson did not consult with him before conceding guilt on two of the counts in closing, Petitioner stated that he "never wanted to plead guilty" despite the record clearly establishing that he had contemplated and requested numerous plea offers, albeit never reaching an agreement on the specific terms. Additionally, although Petitioner initially swore in his affidavit that, "at no point in advance of trial" did Mr. Johnson consult with him about the details of his case, Petitioner admitted on the stand that this was "overstated" and that he was actually consulted about the Indictment, witnesses, and plea offers. *Contrast* Dkt. 140, *with* Dkt. 203 at 51:5-8, 52:24-25, 59:3-8, 72:25-73:3. On a peripheral issue, Petitioner also repeatedly insisted that he filed federal tax returns for 2011, 2012, and 2014—putting this in his original affidavit with the other assertions he makes here and doubling down on it on the stand. Dkt. 140; Dkt. 203 at 64:12-65:1. Yet, Petitioner also affirmed that he had gone over the Presentence Investigation Report, which reported no returns were filed from 2007 to 2012, and had no changes or corrections. Dkt. 91 at 35; Dkt. 113 at 10:17-22.

---

On August 29, 2024, the D.C. Court of Appeals concluded that Mr. Johnson committed reckless misappropriation of entrusted client funds, declining to reach other allegations regarding, *inter alia*, failure to provide a written retainer agreement to clients. Pet. Ex. H. In that proceeding, Mr. Johnson conceded that he misappropriated entrusted client funds but disputed whether his conduct constituted recklessness or negligence. While Petitioner notes that the D.C. Court of Appeals referenced conflicting testimony regarding when Mr. Johnson became aware that his accountant had not been conducting the necessary reconciliation, the Court does not find that to sufficiently discount his testimony before this Court on the core issue of this proceeding.

On December 27, 2024, the Virginia State Bar Disciplinary Board suspended his license based on the D.C. proceedings. Pet. Ex. I.

Statements on the record at the time of trial also further support that Mr. Johnson repeatedly consulted with Petitioner regarding whether he was interested in pleading guilty and that Petitioner had expressed a desire to plead guilty to Mr. Johnson. Dkt. 108 at 6:15 ("I was willing to sign, I was about to sign it . . . ."). Those conversations were then often repeated back on the record without contradiction from Petitioner. Dkt. 110 at 8:11-12:11 (the Government and Mr. Johnson discussing conversations regarding a potential plea); Dkt. 112 at 572:25-574:9 (Mr. Johnson conveying Petitioner's willingness to plead to two counts, in front of Petitioner and in open court).

Accordingly, this Court finds that Mr. Johnson did consult with Petitioner regarding his plan to concede guilt on the two counts in closing. Because Petitioner does not contend that he objected to Mr. Johnson's plan—relying instead on his argument that he was not consulted at all—and this Court has otherwise found Mr. Johnson's testimony regarding these events to be credible the Court also finds that Petitioner did not object to conceding guilt, but instead nodded that he understood the plan.

Finally, the Court also finds that Mr. Johnson conceded guilt on the two counts because he believed it to be in Petitioner's best interest. The Court notes that Petitioner does not contest this point. Moreover, Mr. Johnson credibly testified that he believed the evidence on those counts was overwhelming and that conceding guilt on those two counts could build credibility with the jury. At the close of evidence, Mr. Johnson also raised credit for acceptance of responsibility with Judge O'Grady for those two counts. That Mr. Johnson believed that this was in Petitioner's best interest is further confirmed by his contemporaneous notes. Dkt. 161-1 at 2 (discussing Petitioner's exposure and whether the juror would believe or disbelieve certain witnesses). Accordingly, the Court finds that Mr. Johnson was appropriately guiding the defense pursuant to the strategy he best believed to be in Petitioner's best interest.

IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Petitioner's Motion to Vacate Sentence (Dkt. 138) is DENIED.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
December 22, 2025

_____/s/_____
Rossie D. Alston, Jr.
United States District Judge